**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO._____

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

v.

**APPROXIMATELY $325,942.02 IN UNITED STATES CURRENCY SEIZED FROM ACCOUNT NUMBER 656062707 AT JPMORGAN CHASE BANK;**

**APPROXIMATELY $3,286,947.71 IN UNITED STATES CURRENCY SEIZED FROM ACCOUNT NUMBER 673810815 AT JPMORGAN CHASE BANK; AND**

**APPROXIMATELY $30,670.81 IN UNITED STATES CURRENCY SEIZED FROM ACCOUNT NUMBER 675809187 AT JPMORGAN CHASE BANK,**

        **Defendants *In Rem*.**

_____/

**VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

Plaintiff, the United States of America (the "United States"), by and through its undersigned counsel, alleges upon information and belief as follows:

**I.    NATURE OF THE ACTION**

1. This is a civil action for forfeiture *in rem*, pursuant to 18 U.S.C. § 981(a)(1)(C), the procedures set forth in Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, and the Federal Rules of Civil Procedure, to forfeit a total of approximately $3.6 million in United States currency that constitutes, or is derived from, proceeds traceable to a federal health care offense, in violation of 18 U.S.C. § 1347 (collectively, the "Defendant Assets"):

(i) Approximately[1] $325,942.02 in U.S. currency seized from account number 656062707 at JPMorgan Chase Bank in the name of Medlife Supply, LLC ("Defendant Account 1");

(ii) Approximately $3,286,947.71 in U.S. currency seized from account number 673810815 at JPMorgan Chase Bank ("Defendant Account 2");

(iii) Approximately $30,670.81 in U.S. currency seized from account number 675809187 at JPMorgan Chase Bank in the name of Medlife Supply, LLC ("Defendant Account 3").

## II. JURISDICTION AND VENUE

2. This Court has jurisdiction over this subject matter. *See* 28 U.S.C. §§ 1345, 1355(a); 18 U.S.C. § 981(a)(1).

3. This Court has *in rem* jurisdiction over the Defendant Assets. *See* 28 U.S.C. §§ 1345, 1355(b).

4. Venue for this action is proper in this District because acts or omissions giving rise to the forfeiture occurred in the Southern District of Florida, and because this is the same District where the Defendant Assets were brought upon seizure. *See* 28 U.S.C. §§ 1355(b)(1), 1395.

## III. FACTUAL ALLEGATIONS

At all times material to this action:

### A. The Medicare Program and Durable Medical Equipment

5. The Medicare Program ("Medicare") was a federal health care program that provided free or below-cost health care benefits to certain individuals who are sixty-five years of age or older or disabled. The benefits available under Medicare were governed by federal statutes and regulations.

6. The United States Department of Health and Human Services ("HHS"), through its

---

[1] All dates and amounts referenced in this Verified Complaint are approximate.

agency the Center for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare.

7. Individuals who received benefits under Medicare were commonly referred to as "Medicare beneficiaries."

8. Medicare was a "health care benefit program," as defined by 18 U.S.C. § 24(b).

9. Medicare was subdivided into multiple program "parts."

10. Medicare Part B covered physician services and outpatient care, including an individual's access to durable medical equipment ("DME").

11. DME was equipment designed for repeated use and for a medical purpose, such as orthotic devices, wheelchairs, prosthetic limbs, back braces, knee braces, wheelchairs, nebulizers, and oxygen concentrators.

12. DME companies, physicians, and other health care providers that provided services to Medicare beneficiaries were referred to as Medicare "providers." To participate in Medicare, providers were required to submit an application in which the providers agreed to comply with all Medicare-related laws and regulations. If Medicare approved a provider's application, Medicare assigned the enrolled provider a Medicare "provider number."

13. A provider with a Medicare provider number could file claims with Medicare to obtain reimbursement for services rendered to Medicare beneficiaries.

14. Enrolled Medicare providers agreed to abide by the policies, procedures, rules, and regulations governing reimbursement. Providers were given access to Medicare manuals and services bulletins describing billing procedures, rules, and regulations.

15. To receive payment from Medicare, providers, including DME companies, submitted or caused the submission of claims to Medicare, either directly or through a billing

3

company.

16. A Medicare claim for DME reimbursement was required to set forth, among other things, the name and unique Medicare identification number of the beneficiary, the equipment provided to the beneficiary, the date the equipment was provided, the cost of the equipment, and the name and unique physician identification number of the physician who prescribed or ordered the equipment.

17. A claim for DME submitted to Medicare qualified for reimbursement only if the equipment was medically necessary for the treatment of the beneficiary's illness or injury, prescribed by a licensed physician, and actually provided to the beneficiary as billed.

### B. Health Care Fraud Scheme

18. Medlife Supply, LLC ("MEDLIFE") was an enrolled Medicare provider that purportedly provided DME to Medicare beneficiaries.

19. MEDLIFE was a Florida limited liability company with a principal place of business in West Palm Beach, Florida, which is within the Southern District of Florida.

20. MEDLIFE filed Articles of Organization with Florida's Department of State on or about September 4, 2020, and identified an individual ("Individual 1") as the sole member, manager, and registered agent for MEDLIFE.

21. On or about September 22, 2020, Individual 1 opened Defendant Account 1, that is, MEDLIFE's JPMorgan Chase account number 656062707, using an address for MEDLIFE's purported office in West Palm Beach, Florida.

22. As of on or about December 9, 2020, MEDLIFE was eligible to receive payments from Medicare for DME supplied to Medicare beneficiaries, if the DME was medically necessary.

23. On or about December 15, 2020, a second individual ("Individual 2") obtained

control of MEDLIFE from Individual 1.

24. On or about December 17, 2020, an amendment to MEDLIFE's Articles of Organization was filed with Florida's Department of State, adding Individual 2 as an authorized manager of MEDLIFE.

25. On or about December 22, 2020, an amendment to MEDLIFE's Articles of Organization was filed, removing Individual 1 as an owner/manager and leaving Individual 2 as the sole manager and registered agent for MEDLIFE. The amendments also identified MEDLIFE's new principal place of business to be another address in West Palm Beach, Florida, which is within the Southern District of Florida.

26. That same day, on or about December 22, 2020, Individual 2 took control of Defendant Account 1 and opened Defendant Account 2, that is, JPMorgan Chase account number 673810815. Individual 2 was listed as the sole signatory on Defendant Account 2.

27. On or about December 28, 2020, Medicare received and processed a change of ownership notification identifying Individual 2 as the new sole owner of MEDLIFE. In support of the change in ownership, an executed and notarized bill of sale, dated on or about December 15, 2020, was provided to Medicare showing that Individual 1 sold MEDLIFE to Individual 2 for the purchase price of $10.00.

28. On or about December 29, 2020, Individual 2 opened Defendant Account 3, that is, MEDLIFE's JPMorgan Chase account number 675809187. Individual 2 was listed as the sole signatory of Defendant Account 3.

29. According to travel records obtained by law enforcement, on or about December 31, 2020, Individual 2 took a flight from Miami International Airport to Havana, Cuba, and has not returned to the United States since that time.

30. A review of Medicare claims data shows that in the months after Individual 2 left the United States, MEDLIFE billed Medicare for tens of millions of U.S. dollars, and received more than $10 million in reimbursements for DME claims.

31. Between on or about January 22, 2021, and on or about November 3, 2021, DME claims were electronically submitted to Medicare on behalf of MEDLIFE seeking reimbursement of approximately $35,724,614.

32. Law enforcement agents interviewed all of the physicians identified in the DME reimbursement claims that MEDLIFE submitted to Medicare, who denied prescribing DME to any of the beneficiaries identified in the claims.

33. On or about November 1, 2021, law enforcement agents visited MEDLIFE's purported office in West Palm Beach, Florida, and found that MEDLIFE did not occupy the space. Instead, a different business was located in MEDLIFE's purported principal place of business.

**C.    Defendant Assets**

34. Based on these false and fraudulent claims, Medicare made its first payment to MEDLIFE on or about February 22, 2021, with a deposit of $2,542.71 into Defendant Account 1. The balance of Defendant Account 1 immediately prior to that deposit was only approximately $178.31.

35. Based on a review of account records, almost immediately after the fraud proceeds were transferred into Defendant Account 1, funds were transferred out to Defendant Account 2 and Defendant Account 3.

   **i.    *Defendant Account 1 Contains Proceeds of Health Care Fraud***

36. Banking records show that Defendant Account 1 was almost entirely funded by Medicare reimbursements from fraudulent DME claims submitted by MEDLIFE.

37. Between on or about February 22, 2021, and on or about November 3, 2021, Medicare and secondary payors[2] paid MEDLIFE approximately $10,497,460.56 via checks and direct deposits into Defendant Account 1. During that same time frame, a substantial portion of the funds on deposit in Defendant Account 1 was transferred to other accounts, leaving an account balance of approximately $3,485.36.

38. Bank records show that on or about November 4, 2021, Medicare deposited a combined total of approximately $612,456.66 into Defendant Account 1 to pay fraudulent claims submitted by MEDLIFE.

39. The same day, on or about November 4, 2021, approximately $290,000.00 was transferred from Defendant Account 1 to Defendant Account 2, leaving a balance of approximately $325,942.02 in Defendant Account 1. That entire balance consisted of fraud proceeds.

40. On or about November 4, 2021, JPMorgan Chase froze Defendant Account 1 with that balance, as a result of suspected fraud.

41. Between on or about November 4, 2021, and on or about April 22, 2022, no further deposits or debits were made into or out of Defendant Account 1.

42. On or about April 22, 2022, pursuant to a federal seizure warrant, approximately $325,942.02 in U.S. currency was seized by the United States from Defendant Account 1.

  ii. *Defendant Account 2 Contains Funds Traceable to Health Care Fraud Proceeds*

43. Bank records show that between on or about May 28, 2021, and on or about November 4, 2021, a total of approximately $6,661,231.99 in health care fraud proceeds was transferred from Defendant Account 1 to Defendant Account 2. During that same time frame,

---

[2] Secondary Payors are generally insurance companies that cover certain costs not reimbursed by Medicare. The coordination between primary insurers (*e.g.*, Medicare) and any Secondary Payors helps reduce the total out of pocket costs for either a Medicare Provider or a Medicare Beneficiary.

7

approximately $1,645,500 was transferred out of Defendant Account 2 and deposited in Defendant Account 3 and elsewhere, leaving an account balance of approximately $3,286,947.71.

44. On or about November 4, 2021, JPMorgan Chase froze Defendant Account 2 based on suspected fraud, at which time had a balance of approximately $3,286,947.71. The entire balance was fraud proceeds.

45. Between on or about November 4, 2021, and on or about April 22, 2022, no further deposits or debits were made into or out of Defendant Account 2.

46. On or about April 22, 2022, pursuant to a federal seizure warrant, approximately $3,286,947.71 in U.S. currency was seized by the United States from Defendant Account 2.

### iii. *Defendant Account 3 Contains Funds Traceable to Health Care Fraud Proceeds*

47. On or about November 4, 2021, Defendant Account 3 had a negative balance of approximately –$69,329.19.

48. That same day, on or about November 4, 2021, approximately $100,000 in fraud proceeds was transferred from Defendant Account 2 to Defendant Account 3. Following this transfer, Defendant Account 3 had a balance of approximately $30,670.81.

49. The $100,000 transfer was made up entirely of fraud proceeds previously transferred from Defendant Account 1 to Defendant Account 2 between on or about October 12, 2021, and on or about November 4, 2021.

50. On or about November 4, 2021, JPMorgan Chase froze Defendant Account 3 due to suspected fraud, with a balance of approximately $30,670.81.

51. Between on or about November 4, 2021, and on or about April 22, 2022, no further deposits or debits were made into or out of Defendant Account 3.

52. On or about April 22, 2022, pursuant to a federal seizure warrant, approximately

$30,670.81 in U.S. currency was seized by the United States from Defendant Account 3.

**IV.  BASIS FOR FORFEITURE**

53. Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to a specified unlawful activity offense is subject to civil forfeiture.

54. Pursuant to 18 U.S.C. § 1956(c)(7)(F), any act or activity constituting an offense involving a "Federal health care offense" constitutes a specified unlawful activity.

55. Pursuant to 18 U.S.C. § 24, health care fraud under 18 U.S.C. § 1347 is a "Federal health care offense."

**FIRST CLAIM**
**Proceeds of Health Care Fraud**
**18 U.S.C. § 981(a)(1)(C)**

56. The factual allegations in paragraphs 1 through 55 are hereby re-alleged and incorporated by reference as if fully set forth herein.

57. As set forth above, the Defendant Assets are property that constitutes or are derived from proceeds traceable to health care fraud, in violation of 18 U.S.C. § 1347, which is a specified unlawful activity pursuant to 18 U.S.C. § 1956(c)(7)(F).

58. Accordingly, the Defendant Assets are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

[Intentional Blank Space]

**WHEREFORE**, Plaintiff, the United States of America, requests that the Clerk of the Court issue a warrant for the arrest *in rem* of the Defendant Assets; that notice of this action be provided to persons known or thought to have an interest in or right against the Defendant Assets; that the Defendant Assets be forfeited and condemned to the United States of America; and for such other and further relief as may be deemed just, necessary and proper.

Respectfully submitted,

**MARKENZY LAPOINTE
UNITED STATES ATTORNEY**

By: /s/ *Mitchell E. Hyman*
Mitchell Evan Hyman
Assistant United States Attorney
Florida Bar No. 125405
United States Attorney's Office
99 N.E. 4th Street, 7th Floor
Miami, Florida 33132
Telephone: (305) 961-9283
Email: Mitchell.Hyman@usdoj.gov

## **VERIFICATION**

I, George Lunn, hereby verify and declare, under penalty of perjury, that I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and that the foregoing factual allegations are true and correct to the best of my knowledge and belief.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case, together with others, as a Special Agent with the FBI.

Executed on this 3 of May 2024.

George Lunn, Special Agent
Federal Bureau of Investigation